UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

  - v. -

RAJIV GOEL,

                Defendant.

No. 10 Cr. 90 (BSJ)

ECF CASE

Electronically Filed

# SENTENCING MEMORANDUM ON BEHALF OF RAJIV GOEL

Skadden, Arps, Slate, Meagher & Flom LLP
David M. Zornow
Lawrence S. Spiegel
4 Times Square
New York, NY 10036
(212) 735-3000
(212) 735-2000

*Attorneys for Defendant Rajiv Goel*

**PRELIMINARY STATEMENT**

We respectfully submit this memorandum in connection with the sentencing of Rajiv Goel, scheduled for September 12, 2012. Pursuant to 18 U.S.C. § 3553(a), we request that the Court sentence Mr. Goel to a term of probation. For the reasons set forth below, the requested sentence is appropriate because:

- ➢ Mr. Goel has provided substantial assistance to the government in its investigation of insider trading offenses committed by Raj Rajaratnam and others, including by testifying at trial against Mr. Rajaratnam and assisting the government in obtaining a conviction in an extremely important and high-profile insider trading trial. As a result of Mr. Goel's substantial assistance, we understand that the government intends to submit a letter pursuant to U.S.S.G. § 5K1.1, moving the Court to consider the factors provided by U.S.S.G. § 5K1.1(a) when determining an appropriate sentence for Mr. Goel;

- ➢ Mr. Goel has no criminal history, and apart from his involvement with Mr. Rajaratnam, has led an ethical life;

- ➢ Mr. Goel has paid a heavy price for his involvement with Mr. Rajaratnam. Having spent years building a career in the United States, he is now unable to find employment due to his ruined personal and professional reputation. At the age of 54, Mr. Goel finds himself with no career prospects, and is supporting his family from the proceeds of the sale of his house, the liquidation of some of his retirement savings, and from the generosity of his relatives;

- ➢ Mr. Goel's family – including his wife, his three children, two of whom are attending college and his 93-year-old father in India – rely on him for emotional and financial support. A sentence of probation would appropriately punish Mr. Goel for his illegal conduct, while simultaneously enabling him to rebuild his career and provide support for his family;

- ➢ In a parallel civil enforcement action brought by the Securities and Exchange Commission, Mr. Goel has accepted responsibility for his conduct and has agreed to pay $254,017.73 as part of a Consent Order that was approved by the Hon. Jed S. Rakoff on November 5, 2010; and

- ➢ Other cooperating witnesses in the Galleon cases who testified against Mr. Rajaratnam at trial, such as Anil Kumar and Adam Smith, have been sentenced to terms of probation.

## **DISCUSSION**

I.   **RAJIV GOEL'S PERSONAL HISTORY AND CHARACTERISTICS**

Mr. Goel is a 54-year-old devoted husband, and the loving father of three children.  For Mr. Goel, the most difficult part of the last three years has been the suffering that his actions have caused his wife of 24 years, Alka, and his three children – Vritti, Arushi and Ritij.  Mr. Goel came to the United States in 1982 from India, seeking to further his education and to lay the foundations for a decent life.  Thirty years later, he is a convicted felon who has exhausted his savings and is unable to secure a job.  He understands that he has no one to blame but himself for the decisions that led him to this moment, and he has not shied away from accepting full responsibility for his misdeeds.  However, he hopes that this Court will give him the opportunity to rebuild his life, and to demonstrate that he is a good and honest man who had an egregious lapse of judgment.

A.   **Family**

1.   Mr. Goel's Background in India

Mr. Goel was born in Mumbai, India on June 17, 1958,[1] the youngest of three children born to Surendra and Sarita Goel.  He grew up in a small apartment along with his father, mother, and two older siblings; one brother and one sister.  His father, Surendra, worked at a large Indian conglomerate, eventually rising to be a mid-level executive.  His mother, Sarita, was a homemaker.  Mr. Goel's parents raised him and his siblings to believe that family should be the most important element of their lives, and Mr. Goel continues to hold that belief to this day.  As one of his friends of twenty years has written, Mr. Goel "has always put the welfare of his family and his extended family as top priority."  (Letter of Uday Bellary, Tab 12).[2]  Although Mr. Goel's mother passed away in 2001, his father, brother and sister all still live in Mumbai.  As a result, prior to his arrest, Mr. Goel customarily took multiple trips to India each year, in order to maintain strong ties with his family.

These trips have been particularly important since 2005, given that Mr. Goel's father – now in his 90s – has been seriously ill since that time, suffering from dementia, acute renal issues, severe cardiovascular problems, and the inevitable effects of old age.  Mr. Goel and his father are extremely close, and prior to his arrest, Mr. Goel was able to support his father financially, and also to oversee his treatment through long stays in India.  During this period, family vacations were almost always sacrificed so that Mr. Goel could visit his father's bedside and contribute in person to his continued care.  During these trips, he often slept on hospital floors in order to be close to his father

---

[1]   Mumbai was known as Bombay at the time of Mr. Goel's birth.

[2]   Copies of letters in support of Mr. Goel have not been filed, but have been provided to both the Court and the government.

during difficult times. Mr. Goel's guilty plea in February 2010 rendered these frequent trips impossible, and also undermined Mr. Goel's ability to support his father financially. Indeed, Mr. Goel's father needed to provide Mr. Goel with financial assistance as his son's legal problems mounted. While he has been awaiting his sentence, Mr. Goel has only been able to make a single trip to India to visit his father, in July and August of last year.[3]

Mr. Goel still speaks regularly with his family, and they continue to support him. The letters that members of Mr. Goel's family have written to the Court reflect their belief in Mr. Goel's best qualities. His father writes that:

> [Rajiv] has been a devoted son with a very strong
> commitment to the family which he has demonstrated over
> and over again notwithstanding the distance between India
> and USA. He has made it a point to *always* be available in
> times of family needs and on family occasions and has
> always been very accepting of family's views, especially
> his elders. (Letter of Surendra Jit Goel, Tab 2)

2.   Marriage and Family

In 1988, Mr. Goel married Alka Gupta in India. In the 24 years since they were married, Mr. and Mrs. Goel have become the bedrock of each other's lives. Over the past 24 years, they have relocated from India to the United States and then back to India, before settling permanently in the United States in 2000. Although Alka recognizes that Mr. Goel's conduct was wrong, the bond that the two of them have developed over the past 24 years has been sufficient to see them through their difficulties. Alka writes that:

> Even though my husband was arrested, I still believe in him
> and his integrity. Our belief in doing the right thing
> without fear stood by Rajiv when he admitted to his wrong-
> doings in front of the world, even for actions that he had
> not been charged with. If I may please be very clear
> though: what Rajiv did was wrong but I have forgiven him.
> (Letter of Alka Goel, Tab 1)

Mr. and Mrs. Goel have three children. Their eldest daughter, Vritti, was born in 1990, followed two years later by a second daughter, Arushi. Their son, Ritij, arrived in 1994. Mr. and Mrs. Goel have sought to instill in their children the importance of integrity, just as their own parents instilled the same values in them. Mr. and Mrs. Goel have encouraged their children to flourish in their academic, professional, and personal lives, and both parents have been active participants in their children's school lives. Alka – a trained architect – has remained at home to care full-time for the children,

---

[3]   Mr. Goel traveled to India after receiving the consent of the government and the permission of the Court.

4

while Mr. Goel has been closely involved in the children's academic and extracurricular pursuits. Mr. Goel has served as treasurer for the Parents' Association of their daughters' high school, and has also taken the time to serve as both treasurer and a coach for a local youth soccer club operated under the auspices of the American Youth Soccer Organization, in which his children participated.

Mr. Goel's children have achieved great academic success. This summer, Vritti graduated from Scripps College in Claremont, California, with a degree in molecular biology. Arushi is currently enrolled at the University of Pennsylvania, and is studying for a degree in bioengineering, while Ritij has recently graduated from high school, and will matriculate at Northwestern University this fall. Mr. Goel's children are only now embarking on their lives, but they already recognize the important role that he has already played as a loving father and role model.

    B.    **Professional Life**

        1.    <u>Mr. Goel's Education</u>

Prior to his involvement in the Galleon insider trading network, Mr. Goel had built an exemplary professional reputation. Mr. Goel graduated in 1978 with a Bachelor's degree from Sydenham College of Commerce and Economics, which is affiliated with the University of Mumbai. Following his graduation, he obtained a professional certification from the Institute of Chartered Accountants in India, by sitting for three sections of the required exam simultaneously in 1981. This certification is one of the most prestigious qualifications for accountants in India, and sitting for the three exams at the same time is extremely difficult.

While still awaiting the results of this accountancy exam, Mr. Goel was accepted at the Wharton School at the University of Pennsylvania, to pursue a degree in Management and Business Administration. Mr. Goel leapt at the chance to come to the United States to further his education, and to pursue opportunities which were not available in his native country. At the time, India was undergoing a process of social and economic upheaval, a process that continues to this day. Mr.Goel viewed Wharton as a place where he could expand his horizons, and develop the skills necessary to succeed in the business world. He left India for the first time in January 1982, arriving in Philadelphia at the start of the spring semester. Mr. Goel graduated a year and half later with an MBA in corporate finance and strategy.

It was during his time at Wharton that Mr. Goel first met Raj Rajaratnam. Mr. Rajaratnam, like Mr. Goel, was an international student, hailing from Sri Lanka rather than India. Although they were not extremely close during their time at Wharton, Mr. Goel and Mr. Rajaratnam began a friendship during this period that would deepen in later years. It was this friendship that would ultimately lead Mr. Goel – an otherwise hardworking and ethical man – to violate his duties to his employer and lose nearly everything that he had worked so hard to build.

2. <u>Mr. Goel's Professional Career</u>

Mr. Goel held a number of jobs during the first seventeen years following his graduation from Wharton, both in the United States and in India. Immediately after graduating in 1983, Mr. Goel accepted a job in New Jersey as an investment portfolio manager with Charter Security Life, which was subsequently purchased by Metropolitan Life Insurance Company ("Met Life"). In 1986, Mr. Goel decided to return to India, ultimately joining Bank of America in India in the Corporate Banking group. He remained in this position until 1989 when, newly married to Alka, he decided to return to the United States to build a better life for his family.

When Mr. Goel initially returned to the United States in 1989, he again worked briefly for Met Life in New York, before accepting a job in June 1990 in San Francisco with Bank of America, as a Vice President in the Trade Finance and International Cash Management group. During this period, Mr. Goel became a naturalized American citizen, and each of his three children was born in the United States. Mr. Goel remained with Bank of America in California until February 1996, at which point he came across a start-up company that was working to develop telecommunications technologies in India and several other developing economies in Asia, Africa, and Europe. He accepted a job as the Chief Financial Officer of the start-up, which was called Afro-Asian Satellite Communications, based in New Delhi. After two years in this position, however, Mr. Goel decided that the level of pollution in New Delhi was unhealthy for his young children, and therefore moved his family to Mumbai, which also allowed him to be closer to his aging parents. At this point, he began working at the Aditya Birla Group, a large Indian conglomerate, as the founder and head of their Corporate Finance group.

In 2000, Mr. Goel and his family returned to the United States, this time to stay, after he accepted a job in California as a manager in the Treasury Group at Intel. Mr. Goel has remained in the United States ever since. At Intel, as with all of his prior positions, Mr. Goel established himself as a hard-working, dedicated, and highly capable manager. Mr. Goel's dedication to Intel resulted in a series of promotions – rising from investment manager to senior investment manager to director, and ultimately to managing director in Intel's Treasury Department in 2007. Mr. Goel's successes in Intel's Treasury Department were recognized by the company, and on two occasions he was awarded the prestigious Intel Achievement Award. Receiving this award twice was an honor, as most employees do not receive an Intel Achievement Award at all during their careers at the company.

Throughout his career, the people with whom Mr. Goel has worked have noted his strong work ethic and his dedication to his co-workers. One of his colleagues from his time working in India has written that Mr. Goel "always deeply cared for people working with him" (Letter of Santrupt B. Misra, Tab 7), and the letters that have been written to the Court on his behalf are full of references to Mr. Goel's efforts to act as a mentor to his co-workers. Mr. Goel and his wife would take care of his colleagues' children while they were away; they would invite their colleagues into their home for social gatherings; and Mr. Goel would always be willing to give his colleagues advice on

6

their careers. Mr. Goel is repeatedly described as selfless and trusting, and one friend writes that he "sometimes seemed to lack that sceptical [sic] edge" that is necessary in the business world. (Letter of John Phillips, Tab 16). This may help to explain, although it cannot excuse, his illegal dealings with Mr. Rajaratnam, which ultimately led to his conviction.

## II.   STATEMENT OF THE OFFENSE

### A.   Procedural History

On February 8, 2010, Mr. Goel pleaded guilty to one count of conspiracy to commit securities fraud and one count of securities fraud, for providing information to Mr. Rajaratnam relating to Intel's earnings in the first quarter of 2007, and for providing information regarding a possible investment by Intel in Clearwire Corporation in 2008. Upon his arrest in October 2009, Mr. Goel had initially been charged with one count of conspiracy and two counts of securities fraud for providing Mr. Rajaratnam with the Clearwire information. The addition of the Intel earnings charge in the information was a direct result of Mr. Goel's comprehensive and candid disclosure to the government during his proffer sessions.

### B.   Mr. Goel's Relationship with Raj Rajaratnam

#### 1.   Meeting and Friendship

Mr. Goel first met Mr. Rajaratnam while the two were studying together at the Wharton School in 1982. Their friendship ebbed and flowed over the next twenty years, but became stronger in September 2001, when Mr. Goel called Mr. Rajaratnam a few days after the September 11th terrorist attacks to ensure that he was safe. Over the next eight years, their friendship evolved from occasional telephone calls to frequent conversations between the two men. The friendship eventually resulted in a close bond not only between Mr. Goel and Mr. Rajaratnam, but also between their wives and children. On two occasions, Mr. Goel's and Mr. Rajartnam's families went on vacations together.

During this period, Mr. Goel came to consider Mr. Rajaratnam one of his few close friends, and came to trust him implicitly in ways that he normally reserved for members of his own family. For example, in 2005, Mr. Goel asked Mr. Rajaratnam if he would be willing to make trades on his behalf in his Charles Schwab brokerage account. Mr. Goel knew that Mr. Rajaratnam had a reputation as a successful stock trader, and believed – as did the world at large – that this success was based on Mr. Rajaratnam's abilities as an analyst and trader, not because of any access to inside information.

Moreover, Mr. Rajaratnam proved himself a loyal friend on a number of occasions. In 2005, when Mr. Goel was struggling with the decision whether to buy a home for his family, Mr. Rajaratnam provided Mr. Goel with a $100,000 loan to ensure that Mr. Goel had the money he would need to cover the purchase price. In 2006, when Mr. Goel's father had become seriously ill, and when Mr. Goel began to worry that he

would be unable to keep his father's house in India within the family if his father passed away, Mr. Rajaratnam provided Mr. Goel with a $500,000 gift to help purchase the house. These gifts occurred before Mr. Rajaratnam had started asking Mr. Goel for material nonpublic information, and at the time Mr. Goel did not view this arrangement as an explicit *quid pro quo* by which he was obliged to provide Mr. Rajaratnam with inside information. At the time, Mr. Goel believed that Mr. Rajaratnam was simply acting as a good friend, who had the resources to support him in a time of crisis.

2. <u>Mr. Rajaratnam Manipulated Mr. Goel into Providing him with Material Nonpublic Information</u>

As part of their friendship, Mr. Goel and Mr. Rajaratnam would discuss the technology sector in general, including Intel's business. Mr. Goel understood that he owed duties to Intel, and he knew that it was wrong to provide someone like Mr. Rajaratnam with confidential information regarding Intel's earnings and activities. However, given his enduring interest in developing technologies, he also had a weakness for getting drawn into long conversations about the implications of emerging trends within the technology sector, as well as Intel's strategic plans in response to those trends. Mr. Rajaratnam played upon this weakness, asking Mr. Goel to keep abreast of the latest happenings in California, and to let him know whenever he became aware of interesting developments.

At first, Mr. Goel's conversations with Mr. Rajaratnam involved general discussions about the technology sector, or relatively generic questions about Intel. At the time, Mr. Goel viewed Mr. Rajaratnam's desire to engage in these conversations as a sign of respect, and an indication of the value that Mr. Rajaratnam placed on their friendship. He was not aware that Mr. Rajaratnam was simply laying the groundwork for later questions, when he would induce Mr. Goel to disclose nonpublic information upon which Mr. Rajaratnam could trade for the benefit of his Galleon funds. Starting at the beginning of 2007, Mr. Rajaratnam began steering the conversations away from general questions regarding Intel, and towards increasingly specific and demanding requests for information about the company's quarterly earnings, profits, and other activities.

Mr. Goel knew that providing Mr. Rajaratnam with this information would be wrong, and he initially sought to avoid Mr. Rajaratnam's questions by telling him that he did not have access to that kind of information – as, in fact, he did not. Mr. Goel's position at Intel did not typically provide him with access to the Company's earnings information, or to confidential information about Intel's mergers and acquisitions activities. However, Mr. Rajaratnam did not relent in his questioning, and over time Mr. Goel became unmoored from the values by which he had lived his life up to that point. As the government wrote in its own Sentencing Memorandum for Mr. Rajaratnam, Mr. Rajaratnam "corrupted his closest of friends like Goel, who looked up to and admired Rajaratnam for his purported business success, by bestowing gifts on them, encouraging them to give him inside information, and then berating them if they were unable to provide inside information." Government's Sentencing Memorandum at 25, *United States v. Rajaratnam*, No. 09-cr-1164 (S.D.N.Y. Aug. 9, 2011).

8

In 2007, following Mr. Rajaratnam's repeated requests, Mr. Goel unfortunately made the decision to yield, and provided Mr. Rajaratnam with information relating to Intel's quarterly earnings in the first quarter of 2007, and later about Intel's planned investment in Clearwire in 2008. When he made these decisions, Mr. Goel was aware that Mr. Rajaratnam intended to make stock trades based on the information that he provided, and knew that he was breaching his duty to his employer by disclosing Intel's confidential information. He knew that it was wrong for him to do so and regrets the decision that he made at the time, not only because of the negative consequences that he has justifiably suffered as a result of that decision, but also because of his betrayal of Intel, a company that had vested so much trust in him over the years.

### III. MR. GOEL'S EXTENSIVE COOPERATION WITH THE GOVERNMENT

#### A. Mr. Goel's Extensive Cooperation

Mr. Goel's cooperation with the government during the months prior to Mr. Rajaratnam's trial was significant. Before pleading guilty, Mr. Goel met with the prosecutors in four full-day proffer sessions, as well as attending one proffer session with representatives from the Securities and Exchange Commission. Following his cooperation agreement, he participated in at least eleven meetings with the government, and spent many hours reviewing significant numbers of documents, telephone logs, and audio tapes. Throughout this process, Mr. Goel always answered the questions posed by the government to the best of his ability. All of Mr. Goel's meetings with the government occurred in New York, requiring Mr. Goel to travel frequently to and from his home in California.

Mr. Goel's significant cooperation with the government has continued post-Mr. Rajaratnam's conviction. In October and November of 2011, Mr. Goel and his counsel voluntarily participated in telephone meetings and e-mails with prosecutors in the Central District of California, to provide further information relating to specific securities trades at issue in the Galleon cases that were still under investigation. As recently as July 30, 2012, Mr. Goel spoke with prosecutors in the Southern District of New York, to provide information about certain trades in the Galleon case, which remain subject to investigation. In both of these instances, Mr. Goel again cooperated fully with the prosecutors, including by producing additional documents to the prosecutors in California.

#### B. The Timely and Comprehensive Nature of Mr. Goel's Cooperation

Shortly after his arrest in October 2009, Mr. Goel decided to accept responsibility for his crimes, and to cooperate fully with the government in its ongoing investigation of the Galleon insider trading network. He knew this would involve providing the government with information about – and ultimately testifying at trial against – Mr. Rajaratnam, who had formerly been one of his closest friends.

Mr. Goel demonstrated his willingness to cooperate with the government even before he had received any assurances regarding his own criminal or civil exposure.

9

For example, after his arrest, Mr. Goel was shocked to discover an unexpected balance of $100 million on hold in his Charles Schwab brokerage account; an account to which Mr. Rajaratnam had access.  Knowing that this balance might be pertinent to the government's investigation into Mr. Rajaratnam, Mr. Goel immediately informed the prosecutors about it, even prior to entering into a cooperation agreement.  Although this account entry was ultimately determined to have resulted from an error by Charles Schwab, at the time Mr. Goel did not know that to be the case.  Mr. Goel subsequently met with the government on four occasions during December 2009 and January 2010, providing prosecutors with a comprehensive and complete picture of his illegal conduct – including illegal conduct with which he had not been charged – before ultimately pleading guilty in February 2010.

       For example, as part of his cooperation, Mr. Goel described how he had received earnings information relating to Intel from Alex Lenke, an employee in Intel's investor relations group, in April 2007, and how he had subsequently passed that information to Mr. Rajaratnam with the knowledge that Mr. Rajaratnam would make securities trades based on this information.  Both Mr. Goel and Mr. Rajaratnam were ultimately charged based on these trades.  Mr. Goel also provided the government with additional details about his relationship with Mr. Rajaratnam that would likely otherwise have remained unknown to the government, including the loans and gifts that Mr. Goel had received from Mr. Rajaratnam between 2005 and 2006.

       We anticipate that the government will submit a letter to the Court pursuant to § 5K1.1, which will describe in detail Mr. Goel's significant cooperation over almost three years.

       C.     Mr. Goel's Testimony at Mr. Rajaratnam's Trial

       Mr. Goel's testimony as a government witness played a critical role in ensuring Mr. Rajaratnam's conviction.  Six of the fourteen counts against Mr. Rajaratnam were based in part upon Mr. Goel's testimony  In particular, Mr. Goel was the only corporate insider working for a company in whose stock Mr. Rajaratnam traded to testify against him.  Indeed, in denying Mr. Rajaratnam's Motion for a Judgment of Acquittal, the Hon. Richard J. Holwell noted that, with respect to the charges relating to illegal trading based on Intel earnings information and the Clearwire investment, "a reasonable jury could have found Rajaratnam guilty . . . on the basis of Goel's testimony alone," and Judge Holwell repeatedly cited Mr. Goel's testimony in a variety of other contexts as powerful testimony against Mr. Rajaratnam.  Memorandum Opinion and Order at 21-23, *United States v. Rajaratnam*, No. 09-cr-1184 (S.D.N.Y. Aug. 11, 2011).  Clearly, Mr. Goel's testimony was critical in obtaining a conviction in this most significant insider trading case.

## IV. A SENTENCE OF PROBATION IS APPROPRIATE UNDER THE CIRCUMSTANCES

### A. Applicable Legal Principles

As the Court is aware, it must "undertake an individualized assessment" of the sentence warranted by 18 U.S.C. §3553(a) "based on the facts presented." *United States v. Johnson*, 567 F.3d 40, 50 (2d Cir. 2009) (citing *United States v. Booker*, 543 U.S. 220 (2005). In making this determination, the Court may give fair consideration to the sentencing range under the Sentencing Guidelines; however, the Court must not presume that this sentencing range is reasonable or proper in every case. Instead, in determining the appropriate sentence, the Court must "conduct its own independent review of the [§ 3553(a)] factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550 F.3d at 180, 189 (2d. Cir. 2008) (*en banc*).

18 USC § 3553(a) provides that sentences should be "sufficient, but not greater than necessary" to adequately reflect the seriousness of the offense, impose just punishment, deter criminal conduct, and protect the public from further crime by the defendant. District courts must consider the 18 U.S.C. § 3553(a) factors in imposing sentence, including the sentencing range set forth in the Guidelines, but they have discretion to tailor sentences as they see appropriate based on the "nature and circumstances of the offense and the history and characteristics of the defendant." *United States v. Cavera*, 550 F.3d at 180, 189 (2d. Cir. 2008) (*en banc*) (quoting 18 U.S.C. § 3553(a)).

In addition to the sentencing factors, the court may consider its "own sense of what is fair and a just sentence under all of the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006). The judge may consider "all of the facts that the Guidelines make relevant to the determination of a Guideline sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005).

### B. In Addition to Mr. Goel's Cooperation, a Number of Other Factors Warrant a Significantly Reduced Sentence

#### 1. Mr. Goel's History and Character

As the government has recognized, Mr. Goel was "corrupted" and "manipulated" into breaking the law by Mr. Rajaratnam, whom Mr. Goel described as one of his closest friends. Government's Sentencing Memorandum at 7, *United States v. Rajaratnam*, No. 09-cr-1184 (S.D.N.Y. Aug. 9, 2011). This is not intended to minimize or excuse Mr. Goel's conduct, but, it is important to point out that Goel has no criminal history, and, as the government has acknowledged, "had lived a life free of crime until he started providing Rajaratnam with inside information." *Id*. Simply put, despite his involvement in this matter, "Goel was not even close to Rajaratnam's criminal league." *Id*.

2. <u>Mr. Goel Has Already Suffered Significant Consequences as a Result His Offense Conduct</u>

Mr. Goel has already paid a hefty price for his involvement with Mr. Rajaratnam, in terms of his career prospects and his personal finances, not to mention the toll that the case has exacted on his family. Shortly after his arrest, Mr. Goel lost his job at Intel and has been unable to find any employment in nearly three years as a result Without any source of income, other than the generosity of his family members, Mr. Goel has been forced to sell his house. He also agreed to pay $254,017.73 in disgorgement as part of his settlement with the Securities and Exchange Commission.

Mr. Goel and his family are trying to move forward with their lives. Any sentence of incarceration would delay Mr. Goel's efforts to rebuild his career, and would limit his ability to support those people who depend on him.

3. <u>The Guidelines Are Disproportionate to the Offense Conduct</u>

Under U.S.S.G. § 2B1.4, the guidelines calculation for insider trading offenses should be enhanced based on the "gain resulting from the offense." The draft of the Presentence Report that we have received from the Probation Office places the "gain" arising from Mr. Goel's offenses at approximately $2.8 million, and therefore calculates a guidelines range of between 46 and 57 months. We respectfully submit that this gain calculation unfairly inflates the guidelines range given the circumstances of this case.

Mr. Goel did not benefit directly from the inside information that he provided to Mr. Rajaratnam regarding the 2007 Intel earnings information or the 2008 Clearwire transaction, to which he pleaded guilty. The trades in those stocks were executed by Mr. Rajaratnam in his Galleon funds, and Mr. Goel did not benefit from the gains that accrued to the Galleon funds as a result of these trades. In fact, Mr.Goel had no knowledge about the volume or value of the trades that Mr. Rajaratnam was making at the time. It is true that Mr. Goel benefited financially from his friendship with Mr. Rajaratnam, in the form of the gift and loan described above, as well as the trades executed by Mr. Rajaratnam in Mr. Goel's Charles Schwab brokerage account. However, Mr. Goel did not believe that these gifts and loans were given to him in exchange for the information that he provided. Although Mr. Rajaratnam's loans and gifts "laid the foundation for Rajaratnam's subsequent pressure on Goel to provide him with inside information," Government's Sentencing Memorandum at 7, *United States v. Rajaratnam*, No. 09-cr-1184 (S.D.N.Y. Aug. 9, 2011), they did not represent an "increase in value realized through trading in securities," at least not for Mr. Goel. *See* Background to U.S.S.G. § 2B1.4.

In this context, and as noted above, Mr. Goel has already agreed to pay $254,017.73 as part of a settlement in a civil suit, which better reflects the gain appropriately attributable to Mr. Goel as a result of his misconduct.

12

        4.        <u>A Downward Departure is Necessary to Achieve Consistency of Sentences With Other Cooperators in the Galleon Insider Trading Prosecutions and Related Cases</u>

A sentence of probation for Mr. Goel would be consistent with other sentences imposed on cooperating defendants in the Galleon insider trading prosecutions and related cases.

Two other cooperating witnesses who testified against Mr. Rajaratnam at trial, Anil Kumar and Adam Smith, were both sentenced to probation rather than custodial sentences. Mr. Kumar – who assisted the government with its investigation but was paid directly by Mr. Rajaratnam for inside information, and was more involved in the scheme than Mr. Goel – was sentenced by the Hon. Denny Chin on July 19 to two years' probation. Mr. Smith – another key player in the Galleon insider trading scheme, who only began cooperating with the government almost a year after Mr. Goel's began assisting with the investigation – was sentenced on June 26, 2012 to two years' probation by the Hon. Jed. S. Rakoff. Furthermore, other individuals who did not testify against Mr. Rajaratnam at trial, but who provided assistance in the government's investigation, have also been sentenced to probation. On January 20, 2012, David Slaine was sentenced by the Hon. Richard J. Sullivan to three years' probation on account of Mr. Slaine's substantial cooperation in the government's investigation. Similarly, on June 1, 2012, Judge Sullivan sentenced Franz Tudor, another participant in the scheme, to three years' probation, also as a result of his cooperation with the government.

## IV.    CRIMINAL FINES AND FORFEITURE

    **A.**    **Criminal Fine**

As noted above, Mr. Goel is currently living off the proceeds of the sale of his home, the liquidation of some of his retirement savings, as well as the generosity of his father, brother, and other family members. Loans provided by his family in India have enabled two of his children to attend the colleges of their choice, and have provided basic necessities for himself and Alka.

Mr. Goel has been unemployed for nearly three years now, despite his efforts to secure gainful employment. Mr. Goel will probably have to start a new career, significantly reducing his earning potential at the age of 54.

Other defendants in the Galleon cases – who have access to significantly more resources than Mr. Goel, and who engaged in more culpable conduct – received modest fines, suggesting that no fine is necessary for Mr. Goel. Adam Smith, a trader at Galleon who only began cooperating with the government a year after Mr. Goel had pleaded guilty, received a criminal fine of $15,000 from Judge Rakoff on June 26, 2012. Anil Kumar, who was deeply involved in Mr. Rajaratnam's criminal enterprise, including receiving millions of dollars of payments explicitly in exchange for tips, and concealing those payments by setting up sham companies, received a criminal fine of $25,000.

Considering Mr. Goel's extensive cooperation and financial situation, we respectfully submit that this Court should not impose a fine on Mr. Goel as part of its sentence, other than the $100 mandatory special assessments required for each count.

**B.     Forfeiture Amount**

Although the trades placed by Mr. Rajaratnam based on inside information provided by Mr. Goel earned Mr. Rajaratnam and his investors millions of dollars in profits, Mr. Goel did not receive any direct benefit from these specific trades. Accordingly, the amount that Mr. Rajaratnam profited from trades based on inside information provided by Mr. Goel significantly overstates his gains from his illegal conduct.  We are seeking to reach an agreement with the prosecutors on an appropriate forfeiture amount.

**CONCLUSION**

Rajiv Goel engaged in abberationally wrongful conduct for which he feels deep remorse.  This misconduct stands in stark contrast to the values that Mr. Goel has consistently exhibited throughout his life. Mr. Goel has accepted responsibility for his crimes, and cooperated extensively with the government in its investigation of Mr. Rajaratnam's insider trading network, including by testifying against Mr. Rajaratnam at trial.  For these reasons, and for the additional reasons set forth above, we respectfully request that the Court impose a sentence of probation.

Dated: September 7, 2012

Respectfully submitted:

By: /s/ David Zornow_____
David M. Zornow
david.zornow@skadden.com
Lawrence S. Spiegel
lawerence.spiegel@skadden.com
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel.: (212) 735-3000
Fax: (212) 735-2000

*Attorneys for Defendant Rajiv Goel*